UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LA JUNE KELLY,

        Plaintiff,

        v.

Case No. 17-cv-1357-bhl

NORTH AMERICAN CENTRAL/WISCONSIN CENTRAL,

        Defendant.

**ORDER GRANTING SUMMARY JUDGMENT**

On February 16, 2017, a call came in over the dispatch at the Milwaukee Terminal of North American Central School Bus LLC (North American).[1] ECF No. 62 at 7–13. A school bus carrying students returning from a field trip had been involved in an accident. *Id.* Since the reported location was only two blocks away from the bus terminal, Terminal Manager Brian Walton decided to go on foot directly to the scene, at the intersection of Sixth Street and Oklahoma Avenue,[2] where he witnessed the results of what he later described as the worst accident of his twenty years in the transportation industry. *Id.* Ambulances, police cars, and tow trucks had already arrived at the wreck site. *Id.* Also present was La June Kelly, the driver of the school bus who had radioed in the incident. *Id.* Although Walton quickly concluded that Kelly was *probably* not responsible for the accident, he nonetheless exercised his discretion to have her take a post-accident drug test. *Id.* When Kelly refused to provide a second urine sample after her initial sample was rejected, company policy deemed her to have failed the test and her employment was terminated. *Id.*

Kelly, who is African American, later filed a complaint alleging that the real reason for her discharge was race discrimination in violation of 42 U.S.C. §1981. ECF Nos. 1, 35. North

---

[1] North American Central School Bus LLC does business as Wisconsin Central School Bus LLC and is also known as Illinois Central School Bus LLC. ECF No. 59 at 1.
[2] The complaint refers to Oklahoma Avenue as "Oklahoma Street."

American has now moved for summary judgment. ECF No. 57. For the reasons given below, the Court grants the motion and dismisses the case.

## FACTUAL BACKGROUND

North American is a school bus company that provides student transportation services to schools throughout the country. ECF No. 62 at 1. It operates a bus terminal at 200 West Oklahoma Avenue in Milwaukee, from which it provides local student transportation services for Milwaukee Public Schools. *Id.* The manager of this terminal in 2017 was Brian Walton, who is white. *Id.* at 2; ECF No. 65 at 9. About two thirds of the drivers employed at the terminal were African American, with the remaining drivers being Hispanic, white, or of a different race or ethnicity. ECF No. 62 at 2. Kelly is African American and worked at North American's Milwaukee terminal as a bus driver. *Id.* at 3; ECF No. 63-1 at 3.

In or around December 2016, Kelly met with Walton to request additional time (five minutes) to complete one of her bus routes. ECF No. 62 at 3–4. Walton denied the request. *Id.* at 4. According to Kelly, she responded by raising the specter of racism: "Really? In 2017, you going to tell me this like you just bought the plantation and I'm the slave that came with it. So if somebody want me to do work for them but don't want to pay me right, it's okay? It's okay because my nigger will do it for less?" ECF No. 65 at 13. Walton did not respond. *See id.* He also did not report the comment to human resources or upper management. ECF No. 60 at 16.

Two months later, at approximately 1:30 p.m. on February 16, 2017, Kelly was transporting about 25 students and several teachers to Pulaski School following a field trip. ECF No. 62 at 7. She had stopped her bus at a red light when a van struck the bus from behind. *Id.* The result was a serious accident that caused injury to persons at the scene, including injuries to Kelly, and significant property damage, including damage to the bus. *Id.* at 7–8; ECF No. 65 at 3. At least one other vehicle was hit by the van and totaled as a result. ECF No. 62 at 8.

Walton led the accident investigation. *Id.* at 9. Following Walton's observations and interviews at the scene of the accident, he concluded that Kelly was probably not at fault. *Id.* at 9–10. Nevertheless, he could not "completely discount any possibility that . . . Kelly's performance was a contributing factor to the accident." ECF No. 58-5 at 40. Kelly did not receive a citation for the accident and insists it was clear she played no causal role. ECF No. 62 at 10; ECF No. 65 at 3, 11. Moreover, the day of the accident, Defendant's Safety Coordinator Sandy Baez, after talking with Walton about the accident, completed a collision report for a subrogation

claim, rather than a claim against the company's insurance policy, strongly suggesting that North American did not consider Kelly to have been responsible for the accident. ECF No. 58-2 at 35–36, 47, 49–50; ECF No. 63-3 at 7.

On the day of the accident, Walton decided to instruct Kelly to take a drug test. ECF No. 62 at 9–11. He asked her to finish transporting students and teachers and then return to the terminal for the testing. *Id.* at 11. Walton testified he was "aware that the testing needed to be done relatively quickly as the passage of time would make it less likely that testing could detect whether there were any drugs or alcohol in [her] system at the time of the accident." ECF No. 58-5 at 40. He knew that if he decided not to instruct Kelly to take a test that day, he might lose the chance to attain a drug test of any value. ECF No. 62 at 10.

Accounts differ as to the events of that afternoon. Kelly states that she waited for a different bus to arrive at the scene of the accident, used the new bus to finish transporting students and teachers to the school from the field trip, returned to the terminal, was asked by Walton to complete her two regular end-of-the-day school day transportation routes, completed those routes, and returned again to the terminal. ECF No. 65 at 4–6. According to North American, once it was determined that the bus involved in the accident had no structural damage, Kelly was asked to use that same bus to complete the field trip route (because North American was short-handed on drivers and the remainder of the route was minimal). *Id.* Kelly then completed the route and returned to the terminal, and her other regular end-of-the-day school day transportation routes were re-assigned to a different driver. *Id.*

It is undisputed that Walton drove Kelly from the company's terminal to Concentra Medical Clinic, ECF No. 62 at 11, but, given their different versions of the afternoon's events, the timing of their arrival and departure is unclear. In Walton's telling, he and Kelly arrived at the clinic with enough time to complete a drug test before 5:00 p.m. *See* ECF No. 66 at 6, n. 1; ECF No. 65 at 17 (indicating Kelly never worked past 5:00 p.m.). Kelly insists they did not arrive at the clinic until after 5:00 p.m. ECF No. 58-4 at 13, 16; *but see id.* at 16 ("I'm not sure what time we got back [from the clinic]."); ECF No. 64 at 3 ("[Re-taking] [t]he drug test *was going to* push me beyond my regular work hours." (emphasis added)). Kelly's drug test form is time-stamped at 3:11 p.m. ECF No. 63-2 at 2.

At the clinic, Walton requested that a Department of Transportation (DOT) drug test be conducted and used a DOT "Post Accident" drug test form. ECF No. 65 at 7, 15. North

American's Safety Manual contains a form that can be used for non-DOT testing, but Walton did not use this form. *Id.* at 14–15; ECF No. 63-5 at 2. Kelly reports that she attempted to comply with the testing requirements but ultimately provided a urine sample that was outside the acceptable temperature range for testing. ECF No. 62 at 11. She explains that while she was producing the sample her sweater had gotten stuck in her pant zipper, leading her to place the sample on the cold porcelain toilet for several minutes while she attempted to free her sweater. ECF No. 65 at 7–8.

Regardless of the reason for the unacceptable sample, Kelly was instructed to provide another urine sample to complete the test. ECF No. 62 at 11. She was directed to wait in the lobby of the clinic until she could produce another sample. ECF No. 65 at 8. She waited for some period of time (she claims approximately an hour, *id.*; North American claims 30 minutes, *id.* at 12) but then left without providing another urine sample. Kelly claims she left because the drug test was causing her to work beyond her normal hours and created a scheduling conflict with family obligations relating to her special-needs grandchildren. ECF No. 65 at 2, 8–9; ECF No. 62 at 11–12. She admits, however, that Walton informed her that if she left without completing the drug test, she would be deemed to have failed the test and her employment would be terminated as a result. ECF No. 62 at 11–12. She left anyway.

Back at the terminal, Kelly met with Baez. *Id.* at 12. Baez explained that Kelly would need to complete a rehabilitation program before she would be allowed to be a bus driver again. *Id.* Kelly later paid $500 for the rehabilitation program and completed it at least in part. ECF No. 58-4 at 16, 23–25.

Walton reported to North American's corporate office that Kelly had failed to provide an acceptable urine sample at her drug test. ECF No. 62 at 12. Based on that report, Vice President of Human Resources Keith Lane, in consultation with Safety Director James Love, decided to terminate Kelly's employment. *Id.* at 12–13. The basis for the termination was that: (1) Walton had discretion to require Kelly to take a drug test; (2) Kelly's failure to provide an adequate urine sample amounted to a failed drug test; (3) North American had a zero-tolerance policy for employees who failed a drug test; and (4) the company should not take the risk of allowing Kelly to remain a school bus driver given the circumstances. *Id.* at 13. It is undisputed that North American has always fired an employee after a failed drug test. *See id.*

About two months after she was terminated, Kelly received an email from a DOT official stating that the drug test administered to her on February 16, 2017 had not complied with DOT regulations. ECF No. 65 at 12. When she presented this information to Walton and to Baez, they dismissed it. *Id.* According to Kelly, Baez told her: "So, what? You have an email. Get out of my office." *Id.*

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

## ANALYSIS

The dispositive question in an employment discrimination case is typically "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused [the plaintiff's] discharge or other adverse employment action." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). The Court's analysis is guided by the familiar framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this framework, to proceed with a discrimination claim, the plaintiff must present a prima facie case by showing: (1) membership in a protected class; (2) reasonable job performance in accord with the employer's legitimate expectations; (3) an adverse employment action despite reasonable performance; and (4) similarly situated employees outside of the protected class who were treated more favorably by the employer. *Id.*; *see also Johnson*, 892 F.3d at 894–95. Once shown, the burden then shifts to the defendant to provide evidence of a nondiscriminatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. 792 at 802. If the employer makes this showing, the burden returns to the plaintiff to produce evidence sufficient to establish that the professed reason was pretextual or false. *Id.* at 804.

North American concedes that, as an African American woman, Kelly is a member of a protected class. ECF No. 58 at 1–2. But it insists she cannot make out a prima facie case on any of the other three elements and cannot show that North American's stated reason for terminating her employment was a pretext. On the prima facie case, North American argues: (1) Kelly undisputedly failed to meet its legitimate job expectations by failing the drug test; (2) the drug test (and her termination for failing the drug test) was not an adverse employment action under Seventh Circuit law; and (3) there is no evidence that North American treated similarly situated employees more favorably. *Id.* The Court agrees with North American. Because Kelly fails to muster sufficient evidence to support her claim, North American's motion will be granted.

## I. Kelly Cannot Show that She Reasonably Satisfied North American's Legitimate Expectations Because She Did Not Complete, and Therefore Failed, the Drug Test.

North American maintains that Kelly did not reasonably perform in accordance with its legitimate expectations because she refused to complete the post-accident drug test. ECF No. 58 at 4–5. North American points to its own company policy and to federal and state regulations, all of which subject bus drivers to post-accident drug testing. *Id.* (citing ECF No. 58-4 at 57–59, 62–63; ECF No. 58-5 at 14; Wis. Admin. Code Trans §327.03; 49 C.F.R. §§382.101–727). North American's policy treats a refusal to provide a suitable sample as failing the test and a valid reason for termination. ECF No. 58-4 at 57–59. North American also cites evidence that it has zero tolerance for school bus drivers who fail drug tests and has terminated every employee who has ever failed to produce a suitable sample for testing. ECF No. 62 at 6, 13.

In response, Kelly does not dispute that she failed to provide a suitable urine sample and therefore failed the drug test. Instead, she insists that she has shown she satisfied her employer's legitimate expectations because she was *otherwise* a good employee. She claims she acted "like a grandmother" to many of the kids on her bus route and had good relationships with "tavern goers" who used her bus to travel to Summerfest and other events. ECF No. 60 at 1–2. But to make a prima facie case of employment discrimination, a plaintiff must show more than being a good employee in some areas; compliance with *some* (or even most) of her employer's reasonable job expectations is not necessarily enough. At the same time, one need not be a paragon to bring claims of discrimination. Where the record indicates an employee met some employer expectations but not others, the Seventh Circuit requires a district court to engage in a fact-specific analysis to determine whether the plaintiff's prima facie case of discrimination fails on the second

prong of the *McDonnell Douglas* framework. *See, e.g.*, *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 691–92 (7th Cir. 2006); *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328–29 (7th Cir. 2002). Based on the record in this case, the Court concludes that North American's drug test requirement was a material element of its policy, and Kelly's failure to pass a post-accident drug test is therefore sufficient to disable her prima facie claim of employment discrimination, regardless of her performance in other areas of her job.

Kelly suggests that it was unreasonable for North American even to ask her to take a drug test. ECF No. 60 at 7. She asserts that neither Department of Transportation regulations nor North American's policies *required* her to be drug tested. This is correct. A drug test would only have been mandatory if the accident involved a fatality, she was issued a citation, or it was determined she had contributed to the accident. *See id.* at 7–8; ECF No. 58-4 at 57–59. But that the drug test was not *required* is not dispositive. The record confirms that Walton and North American were within their authority to request a test given the serious nature of the bus accident, and Kelly had no reasonable expectations to the contrary. Under both state and federal regulations, Kelly was subject to random, reasonable-suspicion, and post-accident drug testing as part of her job. Wis. Admin. Code Trans §327.03; 49 C.F.R. §§382.101–727. The record also establishes that Walton, as Kelly's supervisor, had the discretion to instruct her to take a drug test under established company policy, if her performance *could* have contributed to the accident. *See* ECF No. 58-4 at 57–59; ECF No. 58-5 at 14. And North American's safety manual stated that any employee involved in an accident that caused injury or serious damage would be required to take a drug test unless the employee's performance could be *completely discounted* as a contributing factor in the accident. ECF No. 58-5 at 14. Here, Kelly was involved in an accident that caused injuries and serious property damage, and she has not shown that Walton had completely discounted any possibility that her performance had contributed to the accident. Accordingly, Walton's decision to instruct her to take the drug test was within the established bounds of her reasonable employment expectations. It was not an alteration of Kelly's job responsibilities, let alone a materially adverse alteration. This fact alone is grounds for granting North American's summary judgment motion.

## II. No Reasonable Jury Could Find that the Drug Test Was an Adverse Employment Action on the Basis that It Was Administered for Discriminatory or Harassing Reasons.

Even if asking for the test was technically consistent with North American's policies, under Seventh Circuit law it could still be considered an adverse employment action if North American carried out its drug testing requirement in a discriminatory manner. In *Stockett v. Muncie Indiana Transit Sys.*, 221 F.3d 997, 1001–02 (7th Cir. 2000), the Seventh Circuit held that "where a drug test is not performed in a routine fashion following the regular and legitimate practices of the employer, but is conducted in a manner that harasses or humiliates employees, requiring that the employee submit to the drug test as a condition of employment may be an adverse employment action." *Id.* Kelly thus argues that North American carried out its drug testing requirement in a way designed to harass or humiliate her.[3] Subsequent caselaw emphasizes however that the harassing or humiliating conduct must be severe or pervasive to be actionable. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465–66 (7th Cir. 2002) (citing *Stockett*, 221 F.3d at 1001–02).

Citing *Stockett*, Kelly argues that her drug test was not conducted in accordance with state and federal regulations, and that this failure to follow proper procedure indicates an intent to harass or humiliate her. ECF No. 60 at 7–11. This argument is a red herring. The procedural questions Kelly raises do not go to her race or otherwise suggest a discriminatory motivation or intent to harass. When Walton drove Kelly to the drug testing lab, he told the lab worker that Kelly needed a post-accident DOT-required drug test, and the lab used a DOT form. ECF No. 61 at 4 (including paperwork from Kelly's attempted drug test, indicating the test was a "DOT-Drug Screen," and that the reason for the test was "Post Accident"). This was technically incorrect; Kelly's drug test was not required under DOT authority, and federal regulations specify that DOT forms should not be used for non-DOT-authorized drug testing. 49 C.F.R. §382.303 (indicating DOT does not require post-accident drug testing of drivers under circumstances like Kelly's); 49 C.F.R. §40.13 ("DOT tests must be completely separate from non-DOT tests in all respects. . . . As an employer, you must not use the [Federal Drug Testing Custody and Control Form] . . . in your non-DOT drug . . . testing programs."). But this mistake on the type and parameters of the drug test to be

---

[3] Kelly briefly argues in the alternative that North American's decision to fire her was an adverse employment action. ECF No. 60 at 11. Certainly the company's termination of her employment was an adverse employment action. But any claim based on her termination rises or falls with her challenge to the drug test. If the request that she take the test stands as lawful, her termination was also lawful. Kelly does not dispute that North American has a policy of terminating employees who refuse to take drug tests, and there is no evidence that the company has ever deviated from its policy, let alone on racially discriminatory grounds.

conducted did not have any bearing on the integrity of the testing itself or North American's decision to terminate Kelly after she refused to provide a valid sample. Nor is there any evidence the error was motivated by Kelly's race or an intent to harass her. The record establishes that North American usually drug-tested employees only when DOT regulations required it, and thus routinely used DOT forms for these tests. *See* ECF No. 58-1 at 26–27. Here, DOT regulations did not require the test, but North American used a DOT test form anyway. But this was at most a mistake and it has nothing to do with whether Kelly's firing was discriminatory. The record suggests it was simply the result of habit and Kelly offers no evidence other than her own conclusory assertions that it was a hostile departure from protocol.

Kelly also suggests that Walton's decision to instruct her to take a drug test must have been informed by racial animus because Walton stated during a deposition that he had not recently reviewed the relevant employment policy regarding drug testing and did not know about or rely on North American's safety manual when he made the decision. ECF No. 62 at 7; ECF No. 58-1 at 35–36; ECF No. 58-2 at 22–25. Walton indicated in his deposition that he was familiar with, and acted in reliance on, the relevant company policy, even if he had not reviewed the policy recently and even if he had never seen the safety manual. *See* ECF No. 58-2 at 22–25. It is hardly surprising that Walton did not have a regular monthly practice of reviewing the company's drug testing policies and safety manual. That he was aware of and exercised power as provided in the pre-existing policy is sufficient. The failure to review a policy does not suggest racial animus or otherwise indicate harassment.

Kelly raises a number of other issues in an attempt to characterize the decision to require the drug test as harassing and humiliating. She complains that North American required her to finish her routes for the day, take the drug test after her normal working hours, and then eventually choose between attempting to re-take the drug test and going to take care of her grandsons. ECF No. 60 at 10. She also criticizes Walton and Baez for dismissing her charges that the drug test was non-compliant with DOT regulations and for suggesting that she incur the $500 cost of the counseling program as a condition of being rehired. *Id.* There are factual disputes over how long Walton waited before transporting Kelly to the medical clinic and how late she was asked to remain at the clinic (the clinic's contemporaneous written records refute Kelly's claims that the testing took place after work hours), but these disputes are immaterial. It is undisputed that Walton transported Kelly to the medical clinic, where she had enough time to take one drug test and then

wait for at least half an hour before she needed to leave. North American reasonably required completion of the drug test on that day so that the opportunity for getting a reliable drug test was not lost. She knew when she chose to leave that doing so would result in a failed drug test that might lead to her termination. Nothing in the record of North American's conduct that day is sufficient to support a finding that it acted unreasonably or with an intent to harass or humiliate Kelly. Likewise, North American's reaction to Kelly's subsequent complaints about DOT regulations or its referring her to the counseling program do not suggest the drug test was carried out in a harassing or humiliating manner, or that it was otherwise an adverse employment action. None of the actions Kelly cites, whether viewed individually or collectively, rises to the level of severe and pervasive harassment that Section 1981 is designed to prevent. *See Hilt-Dyson*, 282 F.3d at 466.

The only facts Kelly cites to support any sort of racial animus by her employer is the heated exchange between her and Walton that allegedly took place about one month before the accident. In that exchange, involving a disagreement over how much time a certain route should take, Kelly claims she accused Walton of racially discriminatory behavior. Even as Kelly tells it, however, Walton himself did not bring up race in that conversation. ECF No. 58 at 9. In fact, Kelly offers no evidence he ever did or said anything of a discriminatory nature. During her deposition, she specifically declined to identify Walton as a racist. ECF No. 58-4 at 8–9. The complete absence of any evidence of racial animus dooms any effort to recast Kelly's firing as racially discriminatory. There is simply no evidentiary basis for a reasonable factfinder to conclude that race was a factor in North American's decision to instruct Kelly to take a drug test, which ultimately led to her being fired. ECF No. 60 at 16.

### III. Kelly Fails to Identify a Similarly Situated Employee Whom North American Treated Differently on the Basis of Race.

Kelly's prima facie case also falls short because she has not shown that similarly situated employees of a different race were treated differently. Kelly's sole evidence relates to a white bus driver, Kevin Hussey, who she complains was never required to take a post-accident drug test even after being involved in multiple accidents. ECF No. 60 at 11–13. She adds that Hussey, like her, was sitting in a stopped bus when accidents occurred. *Id.*

The record shows, however, that Kelly and Hussey are not comparable. Hussey was involved in minor accidents and was found not to be at fault. ECF No. 62 at 13–14. Unlike the

undisputedly serious accident to which Kelly was a party, Hussey's accidents involved only minimal property damage and no personal injuries. ECF No. 60 at 13–14. Under North American's policy, Kelly was subject to post-accident drug testing, dependent on whether her employer could conclusively rule out the possibility that she contributed to the accident. *See* ECF No. 58-4 at 57–59; ECF No. 58-5 at 14. Hussey was not. Hussey and Kelly were therefore not similarly situated, and to the extent that they could be considered similarly situated, North American enjoyed discretion to treat them differently based on the particular facts of each situation.

## CONCLUSION

For the reasons given above, Plaintiff fails to make a prima facie case that she faced race discrimination.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 57, is **GRANTED**. The action is **DISMISSED** and the Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on February 23, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge